UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FRIENDS OF THE SAN JUANS, FRIENDS OF THE EARTH, and EVERGREEN ISLANDS, <br><br>　　　　　Plaintiffs, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, <br><br>　　　　　Defendant. | Case No.  2:21-cv-01299 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

INTRODUCTION

1.  Plaintiffs Friends of the San Juans, Friends of the Earth, and Evergreen Islands bring this unreasonable delay action to compel the United States Army Corps of Engineers (Army Corps) to complete a court-ordered National Environmental Policy Act (NEPA) Environmental Impact Statement (EIS) and Record of Decision (ROD) with respect to the construction of the North Wing of British Petroleum's (BP) Cherry Point Marine Terminal dock (BP Dock or North Wing), located in Blaine, Washington.  Furthermore, the Plaintiffs seek the Army Corps' determination whether this action violated the "Magnuson Amendment" (33 U.S.C. § 476).

COMPLAINT - 1 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

2. Built in 1971 with a capacity to handle 100,000 barrels per day of crude oil, primarily from Alaska, BP's Cherry Point refinery can now process approximately 250,000 barrels of crude oil per day on average. It is the largest refinery in Washington State and the third-largest refinery on the U.S. West Coast. While the refinery receives some crude by rail and pipeline, most of the crude oil processed at the refinery is delivered by tankers from throughout the world that transit the Salish Sea to the refinery's Cherry Point location. The North Wing, an addition to BP's existing oil refinery dock that doubled the refinery's berthing capacity, has been operational since 2001.

3. In 1992, BP applied to the Army Corps for a Rivers and Harbors Act Section 10 permit to construct the North Wing. Plaintiffs and many others, including the U.S. Fish and Wildlife Service, Lummi Nation, and the Nooksack Tribe, raised concerns about the increase in tanker traffic associated with a dock expansion, increased risk of oil spills, and impacts on endangered species. Despite these concerns, the Army Corps determined that an EIS was not necessary and granted the permit. Environmental groups tried to persuade the Army Corps to reopen the permit and complete an EIS to assess the cumulative impacts that the BP Dock would have on vessel traffic and oil spill risk, and to determine whether the permit violated the Magnuson Amendment. In November 2000, several environmental groups filed a lawsuit against the Army Corps after the Army Corps declined to reconsider or condition the permit.

4. In 2005, several years after the dock became operational, this Court ordered the Army Corps to prepare the BP Dock EIS and to issue a determination as to whether the dock expansion violates the Magnuson Amendment, which regulates permits for oil transport terminals on Puget Sound. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, No. C00-1971L, 2005 WL 2035053 (W.D. Wash. Aug. 22, 2005); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005). The Army Corps took nearly nine years from the date

COMPLAINT - 2 -

of the remand to produce the draft EIS, which was released for comment in May 2014. As of the date of this complaint, the Army Corps has not issued a final EIS or ROD for the BP Dock. In this lawsuit, Plaintiffs ask this Court to find that the Army Corps has unreasonably delayed the EIS, the ROD, and the Magnuson Amendment compliance determination for the BP Dock, and to compel its finalization.

## JURISDICTION AND VENUE

5. Plaintiffs bring this action for review pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201, and injunctive relief pursuant to 28 U.S.C. § 2202.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 704 (APA).

7. Venue is properly vested in this Court under 28 U.S.C. § 1391(b) and (e)(1) because a substantial part of the events or omissions giving rise to these claims occurred in this district, and because Plaintiffs reside and maintain their offices in this district.

## PARTIES AND STANDING

8. Plaintiff Friends of the Earth (FoE) is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation existing under the laws of the District of Columbia with offices in Washington, D.C. and Berkeley, California and staff located across the country. Founded in 1969, FoE is a membership organization consisting of more than 280,000 members and more than 4.5 million activists nationwide. FoE is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. FoE has more than 10,000 members in Washington State. FoE's mission is to protect our natural environment, including air, water, and land, to create a healthier and more just world. FoE utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals. FoE's Oceans

COMPLAINT - 3 -

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340

program works to protect our oceans—as well as the people who live near and the marine creatures who reside in oceans—from the threats of oil spills, air pollution, sewage releases, and unnatural ocean noise.  This work includes extensive advocacy related to the Cherry Point region of Washington.  FoE has worked for many years to ensure that the EIS and ROD for the BP Dock are completed.  FoE has encouraged its members and activists to submit tens of thousands of comments to the Army Corps encouraging it to complete its mandated environmental review of the BP Dock.

9.  Plaintiff Friends of the San Juans (FSJ) is a nonprofit organization dedicated to protecting and restoring the San Juan Islands and the Salish Sea for people and nature.  Founded in 1979, FSJ represents thousands of members and works with diverse stakeholders, including citizens, committees, tribal and governmental agencies, and other nonprofit organizations in the transboundary Salish Sea region.  FSJ's members live, work, and recreate throughout the Salish Sea and share interests in intact shoreline habitats, protective land use regulations and best management practices, safe shipping, clean and ample water, endangered species protection and recovery, and safeguarding recreation opportunities in the San Juan Islands.  FSJ is based in Friday Harbor, Washington.

10.  FSJ's activities include protection of endangered species; marine research and habitat restoration; ecological stewardship and conservation; land use and environmental compliance; and community engagement and education.  FSJ's efforts have produced cleaner, healthier habitats for sensitive species in beaches, parks, and waters; inventories of marine and nearshore habitat to help rebuild depleted salmon stocks; and increased protections for our magnificent Southern Resident Killer Whales.  In 2001, FSJ was a co-petitioner in the lawsuit that led to the federal listing of the Southern Resident Killer Whales as an endangered species under the Endangered Species Act (ESA).  The protection and recovery of the Southern

COMPLAINT - 4 -

Residents continues to be one of FSJ's top priorities, including addressing the impacts to Southern Residents from commercial shipping such as vessel noise that interferes with the orcas' ability to communicate and hunt, vessel presence that disrupts foraging behavior, ship strikes that can cause death, and the risk of a major oil spill that could cause the species' extinction.

11. A key priority for FSJ is protecting the integrity of Salish Sea ecosystems through policy work, reviewing development proposals and permit applications region-wide, and ensuring compliance with existing laws. This is critical work, and particularly in the San Juan Islands, no entity has the capacity or expertise to address these issues in FSJ's absence. Every hour spent by FSJ's staff trying to get the Army Corps to fulfill its long-overdue obligations with respect to the BP Dock EIS and ROD is an hour not spent on addressing other environmental threats to our region, the Salish Sea, and local endangered species. FSJ estimates that, since the Army Corps has failed to complete the court-ordered environmental review, FSJ has had to devote at least 40 hours of staff time to the BP Dock.

12. Plaintiff Evergreen Islands is a small, nonprofit environmental organization (200+ members) based on Fidalgo Island that has been in existence for over 40 years. Its mission is "to promote, protect, and defend the unique ecosystem involving the saltwater islands of Skagit County," which include Cypress Island, Fidalgo Island, Guemes Island, Samish Islands, and many smaller islands. Evergreen Islands' focus is monitoring and supporting the responsible enforcement of local, state, and national laws that protect the environment, specifically the environmental protections contained in municipal comprehensive plans and policies, municipal and county shoreline programs, the Washington State Growth Management Act (GMA), the Washington State Environmental Policy Act (SEPA), the Washington State Shoreline Management Act (SMA), Federal Water Pollution Control Act, and the National Environmental Policy Act (NEPA). Its many successes include not only stopping the production and

COMPLAINT - 5 -

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340

exportation of xylene at the Marathon Anacortes Refinery (formerly Tesoro), but also the construction of a Crude-by-Rail oil terminal at the HollyFrontier Refinery (formerly Shell).  The March Point refineries (HollyFrontier/Shell and Marathon/Andeavor/Tesoro) and BP's Cherry Point refinery pose existential threats to the irreplaceable marine environment in our portion of the Salish Sea.

13. Evergreen Islands' concerns are well founded—the Washington State Department of Ecology, in its 2015 Vessel Traffic Risk Assessment Final Report, indicated that the waterways with the highest risk from potential oil loss from vessels are Haro Strait/Boundary Pass, Rosario Strait, Guemes Channel, and Saddlebag/Huckleberry Pass.  March Point straddles both Padilla Bay (home to the Padilla Bay National Estuarine Research Reserve), and Fidalgo Bay (home to the Fidalgo Bay Aquatic Reserve).  Four oil spills occurred in Fidalgo Bay between 1991-92.  The 1991 spill significantly harmed spawning Fidalgo Bay herring stock and other forage fish (smelt, sand lance, and herring), and over 300 waterfowl and shorebirds were killed from direct oiling.  Despite cleanup efforts, some oil persisted on intertidal beaches for several years.  On April 2, 2010, an accident at the March Point Tesoro Refinery killed seven workers.  At the time of the incident, a heat exchanger was being brought online when the nearly forty-year-old piece of equipment catastrophically failed, spewing highly flammable hydrogen and naphtha which ignited and exploded.  In February 2015, the Shell Puget Sound Refinery took shortcuts in shutting down and decontaminating its east flare system, leading to a release of chemicals that affected hundreds of people.

14. Plaintiffs and Plaintiffs' members regularly use, enjoy, and benefit from the marine environment of the Salish Sea, including the Puget Sound.  Plaintiffs and Plaintiffs' members also regularly use, enjoy, and benefit from the presence of healthy marine life—including threatened and endangered species—within that environment for recreational,

COMPLAINT - 6 -

aesthetic, commercial, scientific, and environmental purposes, such as whale watching, scientific study, and photography. The ability of Plaintiffs and Plaintiffs' members to pursue these interests hinges not only on the well-being of threatened and endangered species that live, migrate, feed, and breed in areas affected by vessel traffic in the Salish Sea, but also on the health of the marine ecosystem on which these species depend.

15. Plaintiffs and their members have for decades committed themselves to protecting the communities, wildlife, and ecosystems connected with the Salish Sea (which includes Puget Sound). Plaintiffs and their members are worried about the increased risk of oil spills, and they fear that any increase in tanker traffic will result in adverse impacts to their recreational, professional, and property interests.

16. Plaintiffs and their members enjoy watching and photographing whales near the San Juan Islands. As such, Plaintiffs and their members are concerned about harm to the critically endangered Southern Resident Killer Whales—a species with a remaining population of only 74 individuals. The BP Dock is located in Southern Resident critical habitat. 50 C.F.R. § 226.206. This community has suffered significant losses over the past few decades due in large part to the loss of chinook salmon that make up the bulk of their diet, persistent pollution, and acoustic and physical disturbances associated with boats and ships. When the National Marine Fisheries Service (NMFS) listed the Southern Residents as endangered under the ESA, the agency noted that these whales are also particularly vulnerable to oil spills because they travel in pods and an entire family group can be lost due to one spill. Their critical habitat entirely overlaps the routes tankers take through the Salish Sea to call on the BP refinery. NMFS recently extended its critical habitat determination to include most of the West Coast which BP tankers transit between Cherry Point and California.

COMPLAINT - 7 -

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340

17. The Rivers and Harbors Section 10 permit that the Army Corps issued to BP in 1996 for the North Wing does not incorporate crude oil tanker limits required by law. With the addition of the North Wing, the refinery is capable of handling more crude oil, or could be capable of handling crude oil with modifications that would not require additional permitting, than it was previously. Moreover, by reducing the congestion at the existing terminal, the construction of a second wing increased the potential berthing capacity of the existing terminal for tankers carrying crude oil. In fact, eliminating the "bottleneck" at the original terminal was the primary purpose for seeking the permit.

18. Existing numbers of vessels carrying both crude and refined oil far exceed the maximum capacity of the dock prior to its expansion in 2001. For instance, the draft EIS documents an increase in crude oil tanker traffic following construction of the North Wing from 108 vessels in 2000 to 174 vessels in 2010.

19. Plaintiffs have been actively engaged in a variety of educational and advocacy efforts to protect the Salish Sea from increased vessel traffic and other harmful impacts. Many of Plaintiffs' concerns were detailed in comments on the 2014 draft EIS for the BP Dock. The Army Corps' delay in discharging its duties affects Plaintiffs' advocacy efforts. Plaintiffs' injuries are fairly traceable to the Army Corps' violations and are redressable by the Court. The Army Corps' failure to comply with its statutory duties has caused and is causing Plaintiffs' members and staff harms connected to their conservation, recreational, scientific, and aesthetic interests. Because the BP Dock has already been constructed and continues to operate in the absence of a final EIS, ROD, and Magnuson Amendment determination, the interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by the Army Corps' violations of federal law, as described herein.

20. Plaintiffs have never sought to have the North Wing removed or abandoned from use, but rather to have the Section 10 permit modified so the entire terminal will comply with the Magnuson Amendment. The Army Corps' failure to impose a cap on the number of crude oil tankers calling on the terminal has compromised the validity of various oil spill risk assessments conducted for this region, as well as Plaintiffs' ability to properly comment on proposed refinery modifications, such as biofuels, that may result in increased tanker traffic.

21. These harms can only be remedied if the Army Corps is ordered to comply with its duties under NEPA. Plaintiffs have no other adequate remedy at law.

22. Defendant United States Army Corps of Engineers is a federal agency within the United States Department of Defense charged with, among other things, issuing permits under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403. The Army Corps must comply with NEPA when issuing a Rivers and Harbors Act Section 10 permit for a project. Because the project involves crude oil transport in "navigable waters in the State of Washington east of Port Angeles," the Army Corps must also ensure that any permit it issues complies with the Magnuson Amendment, 33 U.S.C. § 476.

## STATUTORY BACKGROUND

I. THE ADMINISTRATIVE PROCEDURE ACT (APA)

23. In enacting the APA, Congress provided for sweeping judicial oversight of federal agency action. Specific to this case, pursuant to § 555(b) of the APA, each federal agency has a duty to "conclude a matter presented to it" in "a reasonable time." *Id*. § 555(b).

24. A reviewing court may compel action if the agency has a duty to act and it has "unreasonably delayed" in discharging that duty. *Id*. § 706(1).

COMPLAINT - 9 -

Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340

## II. NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

25. NEPA, 42 U.S.C. §§ 4321–4370f, is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). It makes environmental protection a part of the mandate of every federal agency. 42 U.S.C. § 4332(1). It requires federal agencies to take environmental considerations into account in their decision-making "to the fullest extent possible." *Id*. § 4332. NEPA also supplements the existing authority of agencies to allow them to act based on environmental considerations. *Id*. § 4335.

26. The cornerstone of NEPA's protections is the environmental impact statement ("EIS"). NEPA requires federal agencies to prepare an EIS before undertaking any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS requires a detailed, "hard look" at the environmental impact of—and alternatives to—the proposed action. *See id.*

27. Under this Court's precedent, the Army Corps violated NEPA by failing to prepare a NEPA EIS for the BP Dock. *Ocean Advocates*, 2005 WL 2035053. That failure remains ongoing, sixteen years later.

## III. THE MAGNUSON AMENDMENT

28. The Magnuson Amendment, 33 U.S.C. § 476, which was passed in 1977 to address the threat of oil spills in Puget Sound, regulates permits for crude oil transport terminals on Puget Sound. The law prohibits federal agencies from issuing a permit that "will or may result in any increase in the volume of crude oil capable of being handled at" any facility east of Port Angeles, relative to its capability in 1977, unless the crude oil is for in-state consumption.

29. The Magnuson Amendment applies to the Army Corps' issuance of a permit for the BP Dock. The BP Dock is located east of Port Angeles and provides far more fuel than is
COMPLAINT - 10 -

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340

used in Washington State. Under this Court's precedent, the Army Corps must issue a formal determination as to whether the current Rivers and Harbors Act Section 10 permit for the BP Dock violates the Magnuson Amendment. *Ocean Advocates*, 2005 WL 2035053.

STATEMENT OF FACTS

30. Built in 1971 with a capacity to handle 100,000 barrels of crude oil per day, BP's Cherry Point refinery can currently process approximately 250,000 barrels of crude oil per day on average. It is the largest refinery in Washington State and the third largest refinery on the U.S. West Coast. While the refinery receives some crude by rail and pipeline, most of the crude oil is delivered by tankers that transit the Salish Sea.

31. In 1992, BP applied for a permit to add a North Wing to the existing Cherry Point Marine Terminal, which would double the refinery's berthing capacity. During the public comment period for the permit, the U.S. Fish and Wildlife Service (FWS), Lummi Nation, and Nooksack Tribe raised concerns about an increase in tanker traffic, the associated increased risk of oil spills, and potential impacts on endangered species. FWS asked the Army Corps to complete an EIS to assess increased vessel traffic and cumulative impacts of the BP Dock. In March 1996, the Army Corps issued a Rivers and Harbors Section 10 permit for the expansion and made a Finding of No Significant Impact (FONSI), determining that an EIS was not required.

32. Between 1997 and 1999, environmental groups tried to persuade the Army Corps to reopen the permit to assess the cumulative impacts that the BP Dock would have on vessel traffic safety and to determine whether the permit violated the Magnuson Amendment. The Army Corps declined to reconsider or condition the permit. In November 2000, the groups filed a lawsuit against the Army Corps for failing to complete a NEPA EIS for the BP Dock. Initially, this Court found in favor of the Army Corps. *Ocean Advocates v. U.S. Army Corps of Eng'rs*,

COMPLAINT - 11 -

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340

167 F. Supp. 2d 1200, 1216 (W.D. Wash. 2001), *aff'd in part, rev'd in part*, 361 F.3d 1108 (9th Cir. 2004), *opinion amended and superseded on denial of reh'g*, 402 F.3d 846 (9th Cir. 2005), and *aff'd in part, rev'd in part*, 402 F.3d 846 (9th Cir. 2005).

33.     On appeal, the Ninth Circuit Court of Appeals reversed the district court, finding that the Army Corps' issuance of the Section 10 permit violated NEPA and, potentially, the Magnuson Amendment, 33 U.S.C. § 476. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005). The Ninth Circuit remanded the case to the district court with instructions to remand to the Army Corps so that the Army Corps could (1) prepare an EIS that considers the impact of reasonably foreseeable increases in tanker traffic and (2) reevaluate the dock extension's potential violation of the Magnuson Amendment. *Id*. at 875.

34.     On remand, the district court directed the Army Corps to prepare an EIS for the BP Dock consistent with the Ninth Circuit's opinion. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, No. C00-1971L, 2005 WL 2035053 (W.D. Wash. Aug. 22, 2005). The court also ordered the Army Corps to "revoke the [Rivers and Harbors Section 10] permit or place conditions on the operation of the dock extension if necessary to ensure compliance with the law." *Id*. at *2. However, the Corps neither revoked the permit nor placed any conditions on the operation of the dock during the sixteen years that the project has been operating in violation of NEPA.

35.     On August 16, 2006, the Army Corps published its intent to prepare a draft EIS for the BP Dock in the Federal Register. 71 Fed. Reg. 47,191 (Aug. 16, 2006). In the notice, the Army Corps stated that it expected to publish the draft EIS in Fall 2008. *Id*. at 47,192. The Army Corps, however, took nearly nine years from the date of the remand to produce the draft EIS, which was released for comment in May 2014. The public comment period for the draft EIS closed in August 2014. Plaintiffs submitted extensive comments on the draft EIS,

demonstrating that continued operation of the dock without vessel limits violated the Magnuson Amendment. The draft EIS calculated the maximum capacity of the existing South Wing for crude oil, in the absence of the North dock expansion, at 138 vessel calls per year. Shortly after the North dock was constructed, crude oil vessel calls increased well above these pre-expansion maximums in every year after 2001, reaching a high of 191 vessel calls in 2007. The draft EIS calculates a theoretical maximum capacity of up to 315 crude oil vessel calls at the South Wing when both terminals are in operation. In other words, the draft EIS documents that construction of the North Wing increased the maximum berthing capacity of the South Wing from 138 to 315 crude oil vessels annually. Such an expansion violates the Magnuson Amendment unless it can be shown that the crude is to be refined for in-state consumption. In 2014, available data showed that only 26 percent of the crude oil delivered to BP's Cherry Point facility was used for in-state consumption.

36. Since 2014, Plaintiffs have attended several meetings and engaged in correspondence with the Army Corps regarding the BP Dock EIS and ROD. During the July 2014 hearings on the draft EIS, the Army Corps assured attendees that the final EIS would be completed by December 2014. In December 2015, a year after the Army Corps missed its self-imposed deadline, Plaintiffs wrote to the Army Corps, urging completion and publication of the final EIS within 60 days. The Army Corps responded in a February 2016 letter: "We are working diligently on reviewing and refining preliminary drafts of the Final EIS with the goal of having it published in the spring of 2016."

37. Plaintiffs sent the Army Corps a letter on May 26, 2021, demanding that the Army Corps complete the court-ordered and long-overdue BP Dock EIS. Though not statutorily required, Plaintiffs notified the Army Corps of Plaintiffs' intent to file an unreasonable delay lawsuit if the Army Corps persisted in its delay. In a letter to Plaintiffs dated June 15, 2021, the

COMPLAINT - 13 -

Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340

Chief of the Army Corps' Regulatory Branch asserted that the Army Corps cannot complete the EIS and ROD until NMFS completes Endangered Species Act Section 7 consultation for the BP Dock. This consultation has been pending since 2014. As of the date of this complaint, the Army Corps has not issued a final EIS or ROD for the BP Dock, nor has ESA consultation been finalized. However, NMFS has represented to Plaintiffs that NMFS will issue a biological opinion for the project by September 30, 2021.

## CAUSE OF ACTION

I. THE ARMY CORPS HAS UNREASONABLY DELAYED FINALIZAING THE BP DOCK EIS AND ROD IN VIOLATION OF THE APA.

38. Plaintiffs reallege, as if fully set forth herein, every allegation contained in the preceding paragraphs.

39. The Army Corps took nearly nine years from the date of remand to produce the draft EIS. It has been seven years since the comment period for the draft EIS closed and the Army Corps has not produced a final EIS or ROD.

40. Defendant's unreasonable delay and failure to act violates the APA, which directs agencies to "within a reasonable time … conclude a matter presented to it," 5 U.S.C. § 555(b), and which mandates that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." *Id*. § 555(e).

41. This Court is authorized to review Defendant's unreasonable delay and failure to act under the APA. 5 U.S.C. §§ 551(13), 702. The APA further mandates that the Court shall "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

## REQUEST FOR RELIEF

Based on the foregoing, Plaintiffs request the following relief:

COMPLAINT - 14 -

A. Adjudge and declare that Defendant Army Corps' failure to complete the BP Dock EIS and issue a ROD, including a determination under the Magnuson Amendment, violates the APA;

B. Order Defendant Army Corps to issue its Final Environmental Impact Statement and Record of Decision, including a determination for compliance with the Magnuson Amendment, for the BP Dock within 60 days of NMFS's issuance of its biological opinion;

C. Retain jurisdiction of this matter until Defendant Army Corps has fulfilled its legal and court-ordered obligations as set forth in this Complaint;

D. Award Plaintiffs their reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation; and

E. Grant any further relief the Court deems just and proper.

DATED: September 24, 2021.

Respectfully submitted,

*/s/ Marisa Ordonia*
MARISA C. ORDONIA, WSBA No. 48081
JAN E. HASSELMAN, WSBA No. 29107
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104-1711
(206) 343-7340 | Phone
(206) 343-1526 | Fax
mordonia@earthjustice.org
jhasselman@earthjustice.org

*Attorneys for Plaintiffs*

COMPLAINT - 15 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*